PHELPS ET AL., RESPONDENTS, *v.* GREAT NORTHERN RY. CO., APPELLANT.

(No. 5,001.)

(Submitted January 22, 1923. Decided February 21, 1923.)

[213 Pac. 610.]

*Carriers — Railroads — Livestock Shipments — Delay in Transportation—Interstate Commerce—Removal of Causes—Care of Stock in Transit—Duty of Carrier and Shipper—Instructions — Verdict — Interest— Pleadings— Amendments— Discretion.*

Railroads—Livestock Shipments—Negligence—Removal of Causes—Action not Arising Under Federal Laws.
1. An action to enforce the common-law liability of a carrier for damages resulting from its negligence in the transportation of a shipment of livestock was not one arising under any law regulating commerce within the meaning of the Judicial Code (Chap. 231, 36 Stat. 1092), or under the Carmack Amendment to section 20 (Chap. 3591, sec. 7, 34 Stat. 593), and was therefore not removable on the ground that it arose under the laws of the United States.

Removal of Causes—When Cause Removable.
2. A cause, to be removable to the federal court as involving a controversy between citizens of different states, must be such a one as might have been originally brought in such court.

Same—Diverse Citizenship—When Cause not Removable.
3. Under the rule that where there are two plaintiffs to an action against a carrier who are citizens of and residents in different states and the defendant is a citizen of and resident in a third state and the action is brought in the state in which one of plaintiffs resides, the federal court has no jurisdiction on the ground of diverse citizenship, defendant railway company was not entitled to have the cause removed, where one of the plaintiffs was a citizen of and resident in Wyoming and the other a livestock corporation organized and doing business in Montana, the defendant interstate carrier being a Minnesota corporation.

Railroads—Livestock Shipments—Negligent Delay in Transportation—Instruction—Proper Refusal.
4. In an action against a carrier for negligent failure to promptly transport a shipment of cattle to their destination, where there was evidence that the train was permitted to stand from five to seven

---

1. Carmack Amendment as affecting state regulations as to stipulations limiting liability of common carriers for loss of, or damage to, goods, see notes in Ann. Cas. 1915B, 86; Ann. Cas. 1918E, 471; 44 L. R. A. (n. s.) 257; 50 L. R. A. (n. s.) 819.
3. When defendant corporation is entitled to remove action to federal court on ground of diverse citizenship, see note in 12 Ann. Cas. 520.

hours at the point where connection was made with another line, the court properly refused an instruction that if defendant had been advised by the connecting carrier that the train in question would arrive some six hours after the time at which it should have arrived, defendant was not required to hold the engine or crew until the six hours had expired but could use them in the transportation of other freight, and that its negligence would not begin until the next crew would be available, the instruction failing to advise the jury of defendant's duty to exercise reasonable diligence to transport the train after its arrival at the connecting point.

Pleading and Practice—Amendment of Pleadings During Trial—Discretion.
5. The allowance of an amendment to a pleading during trial is within the sound discretion of the district court, and unless there was an abuse of that discretion will not be considered error.

Same—Amendment of Complaint During Trial—Increase in Amount of Damages—When Nonprejudicial.
6. Permission to plaintiff, just prior to the time he closed his case, to amend his complaint by increasing the amount of damages asked for from $35,000 to $45,000, was nonprejudicial where the verdict was for less than one-half the amount named in the amendment.

Railroads—Livestock Shipments — Unloading, Feeding and Watering—Duty of Carrier and Shipper.
7. Where livestock is shipped under a contract providing that the shipper or his agent shall accompany it and attend to the loading, unloading, feeding and watering of the cattle at his own expense and that on his failure in that respect the carrier shall do so, the shipper cannot recover for damages arising therefrom; where, however, either the shipper or carrier voluntarily undertakes to unload and care for the stock, he cannot ordinarily hold the other responsible for the result of his own negligence in doing so, even though it might otherwise be the duty of the other to do so.

Same—Care of Livestock During Transportation—Erroneous Instruction.
8. Where a contract of shipment of livestock placed the duty of unloading, feeding and watering upon the shipper, and they were unloaded, a part of them being taken charge of by defendant and the rest by plaintiff, an instruction imposing the duty of caring for all of them upon defendant carrier, without regard to the provision of the contract above, and the actual assumption by plaintiff of control over a portion of them, was error.

Same—Feeding and Watering of Livestock—Duty of Shipper Under Contract—Instructions.
9. Where a shipper of livestock by his contract undertook the duty of unloading, feeding and watering the stock en route, refusal of defendant's instructions directed to that subject was error.

Same—Loss of Livestock—Instruction Assuming Fact as Established—Error.
10. Plaintiff claimed to have lost 155 head of cattle by reason of negligent handling in transportation; the evidence showed the loss of 142 head, it leaving the question whether the loss of the other thirteen was due to defendant's fault to conjecture. *Held,* that an instruction that the jury might award damages for the total number claimed to have been lost was error as not warranted by the evidence.

Same—Livestock Shipments—Negligence—Interest Allowable in Discretion of Jury—Instructions.

11.   While under section 8663, Revised Codes of 1921, interest may be allowed in an action for damages to livestock shipments due to the carriers' negligence, the jury should be instructed that the question of interest is left to their discretion, and refusal to so instruct is error.

*Appeals from District Court, Yellowstone County; A. C. Spencer, Judge.*

ACTION by L. G. Phelps and another against the Great Northern Railway Company. From a judgment for plaintiffs and from an order overruling motion for new trial, defendant appeals. Remanded, with directions.

*Mr. I. Parker Veazey, Jr., Mr. W. L. Clift,* and *Mr. R. H. Glover,* for Appellant, submitted a brief; *Mr. Veazey* argued the cause orally.

The Federal Removal Statute (sec. 1010, Compiled Statutes) provides for the removal of all suits of which the federal courts are given original jurisdiction and provides that this removal may be effected by any defendant when the suit arises under the laws of the United States generally and by any non-resident defendant as regards any other case. The federal statute (sec. 991) defining original jurisdiction divides suits into twenty-five classes. Included in the first class are suits arising under the laws of the United States generally. In addition there is a distinct grant of jurisdiction, as an eighth class, of all suits under the Interstate Commerce Act, but it is provided, by way of amendment, that suits arising under section 20 of the Interstate Commerce Act cannot be removed unless the amount involved exceeds $3,000.

As this suit arises under section 20 of the Interstate Commerce Act, it was a suit of which the federal court was given original jurisdiction under class eight and, as the amount demanded exceeded $3,000, it was clearly removable by the express provisions of the statute. (See 3 Foster's Federal Practice, 2899; *Rubber & C. H. T. Co.* v. *Adams Co.,* 210 Fed. 393; *Earles* v. *Germain Co.,* 265 Fed. 715.)

A connecting carrier is not required to remove a shipment out immediately on arrival at the junction and it cannot be held negligent if it moves the shipment out on the first available connection that day.  Much less can it be liable if a connection, already prepared, is missed by the plaintiffs' delay and the carrier moves the shipment by the first available connection after the one the plaintiffs missed by their own acts. (10 Cyc.: Carriers, sec. 407 and 408; *Hickey* v. *Chicago etc. Ry. Co.*, 174 Mo. App. 708, 160 S. W. 24; *Penn. Ry. Co.* v. *Clark* (2d App.), 28 N. E. 208; *N. B. Fails Lubricating Co.* v. *Erie R. Co.*, 112 N. Y. Supp. 432.)

Under the federal law (sec. 8563, subdiv. 5), where the shipper accompanies the stock, the duty rests primarily on the shipper and no duty of loading, unloading or feeding or watering rests upon the carrier except in the single exceptional case where the shipper defaults. (*Atchison, T. & Santa Fe R. Co.* v. *Merchants Livestock Co.*, 273 Fed. 130; *Pennsylvania Ry. Co.* v. *Swift & Co.*, 258 Fed. 289; *Webster* v. *Union Pac. R. Co.*, 200 Fed. 597; *Starr* v. *Chicago B. & Q. R. Co.*, 103 Neb. 645, 173 N. W. 682.)

Under this statute, if the shipper elects to discharge his duty by sending a caretaker, but negligently discharges this duty, or abandons this duty in transit, the carrier may owe a duty to the government, to avoid a penalty, to feed and water the animals, but this is a duty owing to the government and not to the shipper and is imposed, not out of regard for a defaulting shipper, but out of regard to humane treatment of the animals.  Accordingly, where the shipper defaults and the carrier then undertakes to make good the default, so as to avoid penalties, the shipper cannot recover damages caused by his own default which the carrier did not make good. (*Fluckiger* v. *Chicago & N. W.*, 99 Neb. 6, 154 N. W. 865; *Southern Pac. Ry. Co.* v. *Tollerson*, 135 Ga. 74, 68 S. E. 798.) Here, there was no default, in the sense of a negligent discharge of a duty, which is not a default, but in the sense of an election not to assume this duty at all.  The caretaker was on the ground and, by contract and in fact, in charge of

the animals and supervising the unloading, reloading and feeding and watering. There was no default, no election not to assume the duty, but a negligent failure properly to discharge this duty.

It was error to give instruction 11 because it assumed that defendant was negligent and that 155 head died and that the remainder depreciated and that defendant's assumed negligence, if it caused any damage, was the cause of the death of 155 head and of a depreciation in the remainder, and it assumed that defendant's negligence caused all of plaintiff's damage.

It is a well-settled rule of law that the facts are for the determination of the jury, and the court guides the jury merely as to the law and it is accordingly error for the court, in its instructions, to assume as established any fact which is in dispute. (*Allen* v. *Bear Creek Coal Co.*, 43 Mont. 269, 115 Pac. 673; *Lawrence* v. *Westlake*, 28 Mont. 503, 73 Pac. 119; *Collier* v. *Fitzpatrick*, 19 Mont. 562, 48 Pac. 1103; *Palmer* v. *McMasters*, 10 Mont. 390, 25 Pac. 1056; *Lindsley* v. *McGrath*, 34 Mont. 564, 87 Pac. 961; *Ferris* v. *McNally*, 45 Mont. 20, 121 Pac. 889; *Gallick* v. *Bordeaux*, 31 Mont. 328, 78 Pac. 553; *B. & B. M. Co.* v. *Society*, 23 Mont. 177, 75 Am. St. Rep. 505, 58 Pac. 111; *State* v. *Bonning*, 60 Mont. 362, 199 Pac. 274.)

This is not an action on contract, but *ex delicto*, upon the alleged breach of obligations imposed by law upon the defendant as carrier. That interest is only in the discretion of the jury, see *Caledonia Ins. Co.* v. *Northern P. Ry. Co.*, 32 Mont. 46, 79 Pac. 544; *Dewell* v. *Northern P. Ry. Co.*, 54 Mont. 350, 170 Pac. 753; *King* v. *Southern Pac. Ry. Co.*, 109 Cal. 96, 25 L. R. A. 755, 41 Pac. 786. The instruction on the question of interest was erroneous, in any event, in necessarily allowing interest without interest being pleaded or demanded. (*Gulf etc. R. Co.* v. *Lee* (Tex. Civ.), 65 S. W. 54; *Morrison Grain Co.* v. *Missouri Pac. R. Co.*, 182 Mo. App. 339, 170 S. W. 404; *Humphreys* v. *St. Louis etc. R. Co.*, 191 Mo. App. 710, 178 S. W. 233; *Wells Fargo & Co. Express* v. *Crittenden* (Tex. Civ.), 189 S. W. 296.)

*Mr. E. E. Enterline* and *Mr. J. W. Snellbacher*, for Respondents, submitted a brief; *Mr. Enterline* argued the cause orally.

A case involving a federal question can be brought only in the district of defendant's residence. (*Southern Pac. Co.* v. *Arlington Heights F. Co.*, 191 Fed. 101, 111 C. C. A. 581; *Hubbard* v. *Chicago M. & St. P. Ry. Co.*, 176 Fed. 994; *City of Memphis* v. *Board*, 228 Fed. 802.) A cause to be removable as involving either a federal question or a controversy between citizens of different states, must be such as might have been originally brought in the federal court. (*Mexico & Nat. Ry. Co.* v. *Davidson*, 157 U. S. 201, 39 L. Ed. 672, 15 Sup. Ct. Rep. 563 [see, also, Rose's U. S. Notes]; *Stone* v. *Chicago B. & Q. Ry. Co.*, 195 Fed. 832.) A case cannot be removed from a state court to the district court of the United States on the sole ground that it is one arising under the laws of the United States, unless such appears by plaintiff's statement of his own claim, and if it does not so appear, the want of it cannot be supplied by any statement of the petition for removal, or any subsequent pleading. (23 R. C. L. 644–646; *Oregon S. L. & Union N. R. Co.* v. *Skottowe*, 162 U. S. 490, 40 L. Ed. 1048, 16 Sup. Ct. Rep. 869 [see, also, Rose's U. S. Notes]; *W. U. Tel. Co.* v. *Ann Arbor Ry. Co.*, 178 U. S. 239, 44 L. Ed. 1052, 20 Sup. Ct. Rep. 867; *Gableman* v. *Peoria D. & T. Ry. Co.*, 179 U. S. 335, 45 L. Ed. 220, 21 Sup. Ct. Rep. 171; *Great Northern Ry. Co.* v. *Alexander*, 246 U. S. 276, 62 L. Ed. 712, 38 Sup. Ct. Rep. 237.) A suit, which by reason of the nonresidence of both parties, cannot be brought in the federal court in the first instance, cannot be removed to that court from a state court on the ground of diversity of citizenship, at least where the plaintiff resists such removal. (*Ex parte Wisner*, 203 U. S. 449, 51 L. Ed. 264, 27 Sup. Ct. Rep. 150 [see, also, Rose's U. S. Notes]; *Puget Sound Sheet Metal Works* v. *Great Northern Ry. Co.*, 195 Fed. 350.)

Where suit is brought in the first instance in a federal court, upon the ground alone of diversity of citizenship, by more than one plaintiff, against a nonresident defendant, all

of the plaintiffs must be citizens of the state in which the action is brought. (*Ex parte Wisner, supra; Puget Sound S. M. Works* v. *Great Northern Ry. Co., supra; Smith* v. *Lyon,* 133 U. S. 315, 33 L. Ed. 635, 10 Sup. Ct. Rep. 303 [see, also, Rose's U. S. Notes]; *Camp* v. *Gress,* 250 U. S. 308, 63 L. Ed. 997, 39 Sup. Ct. Rep. 478.)   Where a cause of action arising under the Constitution and laws of the United States is alleged, an allegation of diversity of citizenship does not permit the bringing of the action in a district other than that of defendant's residence, as the exception to the rule that actions must be brought in the district of defendant's residence is restricted to cases where the jurisdiction is founded "only" on diversity of citizenship, and "only" means alone, by or of itself, without anything more or exclusive. (*City of Memphis* v. *Board, supra; Camp* v. *Gress, supra.*)

In discussing the question now under consideration in the brief of defendant, counsel urge that the defendant is the only party that has a right to raise the question of diversity of citizenship, or the federal question, if one is involved.   The decisions of the federal courts do not sustain such contention. (*Puget Sound S. M. Works* v. *Great N. Ry. Co., supra; City of Memphis* v. *Board, supra; Hubbard* v. *Chicago M. & St. Paul Ry. Co., supra; Camp* v. *Gress, supra.*)

In a well considered case, the supreme court of Oklahoma has held that in an action for negligent delay in the interstate transportation of livestock, there being some evidence of such negligent delay, it is error to instruct the jury to the effect that if the livestock were transported in accordance with the published schedule of the railroad company the plaintiff could not recover. (*Buel, Pryor & Daniel* v. *St. Louis & S. F. Ry. Co.,* 65 Okl. 108, 163 Pac. 536.)

A railroad company is bound to take reasonable precaution against delay in handling shipments of livestock.   Probable results from weather conditions that may be foreseen must be anticipated. (*Chicago B. & Q. R. Co.* v. *Simpson Bros.,* 23 Wyo. 342, 151 Pac. 902; *Nelson* v. *Great Northern Ry. Co.,* 28 Mont. 297, 72 Pac. 642.)

Notwithstanding the Carmack Amendment, the condition and quality of the goods when they are delivered to the first of the connecting carriers being shown, presumption will arise that they continued in that condition down to the time of their delivery to the carrier completing the transportation and making the delivery to the consignee, and that the injury and loss occurred while they were in such connecting carrier's possession. (*Chicago & N. W. Ry. Co.* v. *Whitnack Produce Co.* (U. S.), 42 Sup. Ct. Rep. 328.)

There are cases which hold that where the shipper defaults in unloading and a railroad company unloads and makes its charge for feeding the cattle, the shipper has a right to recover any damages sustained in the unloading and caring for the cattle by the railroad company. (*Chicago R. I. & P. R. Co.* v. *Scott* (Tex. Civ.), 156 S. W. 294; *Snyder* v. *King,* 199 Mich. 345, 1 A. L. R. 893, 165 N. W. 840; *Gilbert* v. *Chicago, R. I. & P. Ry. Co.,* 132 Mo. App. 697, 112 S. W. 1002; *Pecos & Northern Tex. Ry. Co.* v. *Meyer* (Tex. Civ.), 155 S. W. 309, 6 N. C. C. A. 146.)

This is an action in tort and the plaintiffs are entitled to interest as a part of the measure of damages. (Sec. 8663, Rev. Codes 1921.) This section has been construed by this court and interest held allowable in cases of this kind. (*Caledonia Insurance Co.* v. *Northern Pac. Ry. Co.,* 32 Mont. 46, 79 Pac. 544; *Dewell* v. *Northern Pac. Ry. Co.,* 57 Mont. 350, 170 Pac. 753.)

MR. JUSTICE STARK delivered the opinion of the court.

This action was instituted by the plaintiffs to recover for damages alleged to have been sustained by them as shippers of certain livestock over the defendant's line of railroad.

The complaint alleges that the plaintiff Phelps is a citizen and resident of the state of Wyoming; that plaintiff Galbreath Cattle Company is a Montana corporation engaged in business in this state; that the defendant is a railway corporation, organized under the laws of Minnesota, and engaged as a common carrier in operating an interstate railroad extend-

ing through Montana and other states, and that it maintained a station at Mossmain, in Yellowstone county, Montana, at which point the defendant's line connected with the line of railroad of the Chicago, Burlington & Quincy Railroad Company from Cody, Wyoming; that from Mossmain the defendant's line of railroad extended to Seville, in the state of Montana; that on the sixteenth day of July, 1917, at Cody, Wyoming, the plaintiffs delivered to the Chicago, Burlington & Quincy Railroad Company 984 head of cattle in good, sound and healthy condition, which were loaded into thirty-two cars and consigned for transportation over said railroad and its connecting carrier, the defendant, to Seville, Montana; that the cattle were promptly transported by the Chicago, Burlington & Quincy Railroad Company to Mossmain and delivered to the defendant in good, sound and healthy condition; that when the train of cattle arrived at Mossmain the weather was extremely hot and sultry; that the defendant was advised by plaintiffs, and knew, or by the exercise of ordinary care could have known, that, unless said train was kept moving, there was great danger of the cattle becoming overheated and that injury and loss would result therefrom, and that thereafter defendant was negligent in the handling of said trainload of cattle in the following particulars:

(a) That it left the train standing on its tracks at Mossmain in a period of hot and sultry weather for about seven hours.

(b) That after the train left Mossmain it was stopped and allowed to stand for several hours in a suffocating gravel pit or deep cut, and was also unreasonably delayed at other points between Mossmain and Great Falls; that by reason of these delays it became necessary to unload said cattle at Great Falls.

(c) That after the train arrived at Great Falls it kept the cattle confined in cars for a number of hours instead of unloading them without delay, and prodded and clubbed a number of them.

(d) That it failed to afford reasonable means and opportunity for unloading, feeding, watering and resting the cattle at Great Falls, where they were unloaded for that purpose.

(e) That it failed to unload said cattle at Great Falls into properly equipped pens for rest, feed, and water.

(f) That it did not transport the cattle to Seville within a reasonable time, so that, instead of reaching that point July 18, they did not reach there until July 22.

The complaint further alleges that by reason of these acts of negligence the cattle became "overheated, bruised, shrunken, emaciated, and rendered sick, feverish and of stale and unmarketable appearance and condition, lowered in grade, quality, and selling market value, greatly reduced and lessened in weight, and seriously injured and damaged, and 149 head thereof were killed and died in transit," by reason of which the plaintiffs suffered damage in the sum of $45,633.

The defendant appeared in the action and filed a petition for removal thereof to the district court of the United States in and for the district of Montana, upon the grounds that the suit is of a civil nature, where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000 and (a) arises under the Constitution or laws of the United States, and (b) is between citizens of different states. A proper and sufficient removal bond for costs was filed, but the petition for removal was denied.

All the alleged negligent acts of the defendant were put in issue by its answer, which admitted the formal matters pleaded and also the receipt and transportation of the cattle by the Chicago, Burlington & Quincy Railroad Company, as alleged in the complaint, and their delivery to it at Mossmain. But it is alleged that the cattle were not in good, sound, healthy condition for shipping when they were delivered to the Burlington Railroad or when delivered to the defendant, and that said stock was shipped under a bill of lading and live stock shipping contract which provided, among other things, "that the said cars and the animals contained therein should be in the sole charge of a person designated by the shipper to accompany the same for the purpose of attention to and care of said animals in transit, and that said animals should be loaded, watered and fed by the shipper or the agent in charge";

admitted that after the train was set out at Mossmain it was
not moved therefrom until about five or six hours thereafter,
and that ''after said train left Mossmain until the same ar-
rived at Great Falls, Mont., the weather was extremely hot,
and that said cattle, by reason of said hot weather and the
facts herein set forth, became overheated, prostrated and sick,
and that 142 head thereof died at Great Falls, Mont., either
at the time of the arrival of said train there or within a few
days thereafter''; denied that the death or any injury to the
cattle was due to any negligence on the part of the defendant;
but alleged that the same was due to and caused by certain
acts or omissions of the plaintiffs, to-wit: (a) That when
the cattle were delivered to the Burlington for transportation,
and likewise when they were delivered to the defendant at
Mossmain, they were not in good shipping condition; (b)
that the plaintiffs had negligently failed to water the cattle
for a long time and unreasonable length of time prior to the
loading thereof on the cars; (c) that they had negligently
overdriven said animals and milled the same for several days
prior to the loading thereof; (d) had negligently overloaded
the animals in cars at Cody; (e) had negligently failed to
give said cattle attention when they first showed signs of be-
coming weak; (f) had negligently failed to adequately care
for the animals in transit; and (g) had negligently dispatched
but one caretaker in charge of said livestock, who could not,
by reason of the size of the shipment and otherwise, adequately
care for the same—and that by reason of these acts the cattle
became prostrated by heat and by lack of water and became
sick so that 142 head died as set forth above.

For a second and separate defense the answer alleges that
the plaintiffs' damage, if any, was due to and caused by the
contributing fault and carelessness of the shippers for the
same reasons and upon the same grounds above set forth.

The affirmative allegations of the answer were put in issue
by the plaintiffs' reply, which further alleged that at the times
mentioned in the complaint and answer the defendant did not
maintain at the station of Mossmain, or along its line of rail-

road from said station to the station of Seville, reasonable or adequate facilities or properly equipped pens for resting, watering, and feeding the cattle; that when the train carrying the cattle arrived at Judith Gap the cattle were suffering with heat; that the defendant was thereupon advised of the condition of the cattle by the plaintiff's agent in custody of the shipment, and the defendant then told the plaintiff's agent that there were no facilities to unload said cattle for rest, care and attention at said station, but that the train would be rushed to Great Falls, where there were adequate facilities, but that, notwithstanding these facts, the train was not transported with reasonable dispatch from Judith Gap to Great Falls.

The cause was tried before a jury, which returned a verdict in favor of plaintiffs in the sum of $20,685.90, upon which judgment was entered. The defendant moved for a new trial, which was denied, and from this judgment and the order overruling its motion for a new trial it has appealed to this court.

The testimony in the case is voluminous, and we do not deem it necessary to set it out in detail, but will refer to portions of it when necessary in the course of the discussion of the various specifications of error.

1. Defendant first contends that it was error for the court [1] to deny its petition for removal of the cause to the federal court. This petition was based on two grounds: (1) That the action arose under the laws of the United States; (2) that it is between citizens of different states.

This is an action to enforce the common-law liability of the defendant for damages resulting from its negligence to an interstate shipment, and it is held that such an action is not one arising under ''any law regulating commerce'' within the meaning of the Judicial Code (Act March 3, 1911, Chap. 231, 36 Stat. 1092; U. S. Comp. Stats., sec. 991[8] of which the district court, by paragraph 1, is given jurisdiction regardless of citizenship, nor as based on the so-called Carmack Amendment to section 20 of the Act, embodied in Act June 29, 1906, Chap. 3591, sec. 7, 34 Stat. 593 (U. S. Comp. Stats., secs.

8604a, 8604aa), requiring the issuance of bills of lading for interstate shipments, the purpose of which is to make the carrier issuing such bill liable thereunder by statute for any loss or damage occurring on connecting lines. (*Storm Lake Tub & Tank Factory* v. *Minneapolis & St. L. Ry. Co.* (D. C.) 209 Fed. 895; *Adams* v. *Chicago G. W. Ry. Co.* (D. C.) 210 Fed. 362.) Therefore it was not removable on the first ground of defendant's motion.

In the case of *Smith* v. *Lyon,* 133 U. S. 315, 33 L. Ed. 635, [2, 3] 10 Sup. Ct. Rep. 303 [see, also, Rose's U. S. Notes], it appeared that the plaintiffs were copartners, one of them being a resident and citizen of Missouri, and the other a resident and citizen of Arkansas. They commenced an action in the circuit court of the eastern district of Missouri against the defendant Lyon, who was a citizen and resident of Texas. The petition set out a cause of action of which the court had jurisdiction so far as the nature of the same and the amount involved were concerned. The defendant appeared specially and filed a plea to the jurisdiction of the court on the ground that the suit was not brought in the district of the residence of either the plaintiffs or defendant. This plea was sustained, and the action dismissed. On appeal to the supreme court of the United States the judgment was affirmed, the court holding that under the federal statute a circuit court of the United States has no jurisdiction on the ground of diverse citizenship if there are two plaintiffs to the action who are citizens of and residents in different states and the defendant is a citizen of and resident of a third state and the action is brought in the state in which one of the plaintiffs resides. In the case of *Camp* v. *Gress,* 250 U. S. 308, 63 L. Ed. 997, 39 Sup. Ct. Rep. 478, the reasoning in the case of *Smith* v. *Lyon, supra,* was expressly approved and applied. So far as the point here involved is concerned, the federal statute which was construed in *Smith* v. *Lyon* is the same as the existing statute.

A cause, to be removable as involving a controversy between citizens of different states, must be such a one as might have been originally brought in the federal court. (*Tennessee* v.

*Bank,* 152 U. S. 454, 38 L. Ed. 511, 14 Sup. Ct. Rep. 654 [see, also, Rose's U. S. Notes] ; *Mexican National Bank* v. *Davidson,* 157 U. S. 201, 39 L. Ed. 672, 15 Sup. Ct. Rep. 563; *Cochran* v. *Montgomery County,* 199 U. S. 260, 272, 50 L. Ed. 182, 4 Ann. Cas. 451, 26 Sup. Ct. Rep. 58.)

Since, under the rule laid down by the supreme court of the United States in *Smith* v. *Lyon, supra,* the plaintiffs could not have originally brought this suit in the federal court of Montana, it could not be removed thereto by the defendant, and the court did not err in denying defendant's petition for removal.

We have given consideration to the case of *General Investment Co.* v. *Lake Shore & Mich. S. Ry. Co.* (November 27, 1922), 67 L. Ed. ——, 43 Sup. Ct. Rep. 106, and also to the case of *Lee* v. *C. & O. Ry. Co.* (January 22, 1923), 67 L. Ed. ——, 43 Sup. Ct. Rep. 230. In view of the reasons given by the court for its holding in *Smith* v. *Lyon, supra,* we find nothing in these cases to warrant a departure from the rule therein announced.

2. The defendant's specification of error No. 3 relates to the [4] refusal of the court to give its requested instruction No. 6, which is as follows: "If you find from the evidence that defendant had advices from the Burlington that the stock in question would be delivered at Mossmain at 4 P. M., and accordingly defendant made arrangements to make a connection out of Mossmain for them, based upon said advices, and was then advised that said shipment would not arrive until 10 P. M., defendant was not required to hold the engine or crew longer, but was entitled to use the same for other freight, and any delay on the part of the defendant which could be negligence on its part would begin not earlier than the time when the next available crew or connection was available."

Prior to the loading of the cattle at Cody one of the plaintiffs had counseled with the defendant's agents and had told them of the necessity and desirability of making a quick run from Cody to Seville, and was advised by them that, if the run from Cody to Mossmain could be made in eight hours or less,

the run to Seville could be completed in less than thirty-six hours, which would avoid the necessity of unloading and feeding in transit.

The first advices from the Chicago, Burlington & Quincy Railroad Company at Cody to the defendant were to the effect that the cattle would reach Mossmain at 4 o'clock P. M. However, they were not loaded in time to enable the train to reach Mossmain at that hour, and subsequently the defendant was notified by the Chicago, Burlington & Quincy Railroad Company that the train would not reach Mossmain until 10 P. M.

The testimony disclosed that in accordance with the first advices defendant had made arrangements to have an engine and crew ready for the stock train at 4 P. M., but on being notified that it would not reach Mossmain until 10 P. M. that engine and crew were used for other purposes. Later an order was given by defendant to another engine and crew for 9:45 P. M. but the defendant's dispatcher testified he could not get the engine and crew at that hour for the reason that the crew's rest would not be up until 12:30 A. M. It developed that, when the engine was finally ready to move, there was a considerable delay on account of a derailment, so that it was not available to take the stock train from Mossmain until 5 A. M. according to the defendant's testimony, and not until 6 or 6:30 according to the plaintiffs.

Pursuant to the information conveyed to defendant by the plaintiffs, as above stated, the company's dispatcher had given instructions that the train carrying the plaintiff's cattle was to have a strictly first-class run, making twenty miles an hour, including all delays, for the reason that the shippers were extremely anxious that the stock should go through to Seville without unloading. These instructions were embraced in a telegram or order introduced in evidence on behalf of the defendant.

The fact that defendant had allowed this train to stand on the track at Mossmain for a period of five to seven hours was some evidence of negligent delay. In the case of *Buel* v. *St. Louis & S. F. R. R. Co.*, 65 Okl. 108, 163 Pac. 536, it was

held that in an action for negligent delay in the interstate transportation of livestock, there being some evidence of negligent delay, it was error to instruct the jury to the effect that, if the livestock were transported in accordance with the published schedule of the railway company, the plaintiff could not recover. The train in this case was not being run on a regular published schedule, but as an extra stock train, and the defendant was under obligation to exercise reasonable diligence to move the same after it arrived at Mossmain, regardless of what had transpired prior to that time.

We think the offered instruction was open to the objection that it failed to advise the jury that the defendant would be required to exercise reasonable diligence to transport the train of cattle after it had arrived at Mossmain. The statement "negligence on its part would begin not earlier than the time when the next available crew or connection was available" leaves the question of reasonable diligence out of the case. The court did not commit error in refusing the instruction.

3. The defendant urges that the court committed error in [5, 6] allowing the plaintiffs to amend their complaint, increasing the amount of damages claimed from $35,000 to $45,000, which amendment was permitted just prior to the time the plaintiffs closed their case. The testimony on the part of the plaintiffs tended to show that the total amount of damage sustained by them was $33,829.52. Under the repeated decisions of this court the allowance of an amendment is within the sound discretion of the court, and, unless there is an abuse of this discretion, it will not be considered as error. In view of the fact that the jury subsequently returned a verdict of less than one-half the amount asked for by the plaintiffs under the complaint as amended, we do not think the amendment as made prejudiced the rights of the defendant.

4. The defendant specified as error V-A that the court erred [7, 8] in giving plaintiffs' requested instruction No. 8, which is as follows: "You are instructed that, if you find from the evidence in this case that the defendant in this case undertook

and did unload the cattle at Great Falls, Mont., for the purpose of feeding, watering, and caring for the same, and that plaintiffs compensated the defendant for the feeding thereof, then it was the duty of the defendant to unload the cattle in a humane manner into pens properly equipped for rest, water and feeding, and while the cattle were so unloaded it was the duty of the defendant to properly feed and water the same during the time the cattle were at Great Falls, Mont.''

The rule is that when, as in this case, livestock is shipped under a valid, written contract providing that the shipper or his agent shall accompany them, and that he shall attend to the loading, unloading, feeding, and watering of the same at his own expense, and that on his failure to comply with this requirement the company shall do so, failure on the part of the shipper to comply with the contract is a default on his part, and he cannot recover for damages arising therefrom. (*Southern Ry. Co.* v. *Tollerson*, 135 Ga. 74, 68 S. E. 798; 4 Elliott on Railroads, sec. 2346.) However, it is also the rule that, if either the shipper or carrier voluntarily undertakes to unload the stock, he cannot ordinarily hold the other responsible for the result of his own negligence in doing so, even though it might otherwise be the duty of the other to unload and care for the stock. (4 Elliott on Railroads, 3d ed., sec. 2346.)

In the case of *San Antonio & A. P. Ry. Co.* v. *Dolan* (Tex. Civ. App.), 85 S. W. 303, it was held that a provision in a livestock shipping contract that the shipper should attend to loading and unloading at his own risk might be reasonable and valid, but it would not apply when the carrier himself in fact assumed control of the matter of loading and unloading. To the same effect is the case of *Norfolk & W. R. R. Co.* v. *Sutherland*, 89 Va. 703, 17 S. E. 127.

It therefore becomes necessary for us to review the testimony with reference to the unloading of the cattle at Great Falls and also their care while at that place. The witness Wright, who accompanied the train as plaintiffs' caretaker, stated that the train arrived at Great Falls at about 6 P. M. on July 17th,

and was placed on the side-track, where it remained for brobably more than an hour, after which it was taken to the stockyards, where the unloading commenced; that immediately on the arrival of the train at Great Falls he went to dinner, and did not return for probably an hour; that in the process of unloading he only had the assistance of the trainmen and a section crew, and that he gave no directions at all in connection with the unloading; that the crew which was assisting was in charge of a foreman for the company.

Frank Carney, a witness in behalf of the plaintiffs, testified that he saw the cattle in the yards at Great Falls between the hours of 6 and 8 o'clock on the morning after the shipment arrived; that he did not know Mr. Wright, but saw some one there who seemed to represent the shipper; that it did not appear to him that the unloading was being properly conducted, so he reported the matter to Mr. Pewters, the defendant's agent, saying, in substance, that for the protection of those cattle he, the agent, should get in and give them the attention that they required; whereupon Mr. Pewters requested the witness to look after them, and he did so to some extent.

One of the defendant's witnesses, John Ewinsky, who was the conductor in charge of the train in question from Judith Gap to Great Falls, testified that he was present when they began to unload and had charge of the train; that there were section men present assisting; that when the train arrived at Great Falls he and Wright went to dinner; and that the unloading started after they returned.

Calvin Hankins, also a witness on behalf of the defendant, testified that he was roadmaster at Great Falls at the time and assisted in unloading the cattle; that he was called at 7 o'clock; that he did not know whether the caretaker was present when he arrived; but that he was there during the course of the evening. On cross-examination he stated: "My men had charge of the unloading that evening; were assisting in the unloading."

Another of the defendant's witnesses, Mr. Grueger, testified that he was general foreman of the defendant company on July 17th, and as such assisted in looking after the unloading of the cattle; the unloading started about 7:30 in the evening, and he arrived there about a quarter of 8 and stayed until 9:30 on the following night; that he did not see the man in charge until about 10 o'clock, and then did not know who he was until so informed by the special agent's department; after that he (Wright) did not give any instructions; he was simply in there helping like anybody else; that when he went to work the Greek section hands were assisting. "As far as the unloading was concerned, that was attended to by Mr. Hankins and myself."

With reference to the care and feeding of the cattle after they were unloaded from the cars, the testimony shows that those which were not down and which did not die before they were reloaded onto the train were under the charge of the plaintiffs, while those which were down and did subsequently die at Great Falls remained under the charge of the defendant. Speaking of those which were in charge of the plaintiffs, the witness Wright stated: "After they were all unloaded the cattle were kept for a time in the yards; then these were herded in a field that lies between the Milwaukee and the Great Northern tracks. A man by the name of Milsap, also an employee of plaintiffs, and myself were taking care of them while they were there."

The testimony disclosed that the cattle were shipped under the contract set forth in defendant's answer, which provided: "That the said cars and the animals therein contained shall be in sole charge of such person or persons for the purpose of attention to and care of said animals in transit, and said animals are to be loaded, unloaded, watered and fed by the shipper or his agents in charge." As above shown, the caretaker, Wright, was present when the unloading of the cattle began, and he was bound by contract to attend to it. However, the testimony is susceptible of a construction that the defend-

ant's agents did in fact assume the duty of unloading the cattle, for the defendant's yardmaster, Hankins, said, "My men had charge of the unloading that evening, were assisting in the unloading," and the defendant's general foreman, Grueger, said, "As far as the unloading was concerned, that was attended to by Mr. Hankins and myself."

As to the watering and feeding of the cattle after they were unloaded, we direct attention to the fact that until they were reloaded for shipment to Seville, all of the cattle (about 835 in number) which were not down and did not die were taken in charge by the plaintiffs and were kept in a yard or field between the Great Northern and Milwaukee tracks, being herded by employees of the plaintiffs.

Even though the instruction may have been warranted by the testimony so far as it related to the actual unloading of the cattle, the part thereof which told the jury that, "while the cattle were so unloaded, it was the duty of the defendant to properly feed and water the same during the time the cattle were at Great Falls," was clearly outside the record, in that it failed to differentiate between the cattle which were actually and beyond dispute taken charge of, herded and cared for by the plaintiffs and those which remained in charge of the defendant. In so far as the instruction placed upon the defendant the duty of caring for the cattle which were in actual charge of the plaintiffs, it imposed a duty upon it which the plaintiffs themselves had by contract and in fact assumed to discharge. The giving of this instruction was error.

5. Defendant's requested instructions Nos. 27 and 27A were to the effect that the duty to unload and reload the cattle in [9] transportation and to supervise the same rested upon the plaintiffs, and that defendant was under no obligation to furnish expert help in that regard, and that plaintiffs could not complain because the men who assisted were not expert, and likewise that they could not recover damages, if any, resulting from negligence on the part of the plaintiffs in not

properly supervising the same or to which their negligence in that connection contributed. As above shown, the contract under which the cattle were shipped expressly provided that the duties pointed out in these instructions were assumed by the plaintiffs, and the law as stated in *Southern Ry. Co.* v. *Tollerson* and 4 Elliott on Railroads, *supra*, is that the plaintiffs' failure to comply with this duty was a default on their part, and they could not recover damages arising therefrom. The duties imposed on plaintiffs under this contract were not called to the attention of the jury by any instruction given by the court, as they should have been. The offered instructions were directed to that specific subject and should have been given. The court's refusal to give them was error.

6. By instruction No. 21 the court told the jury: "You are [10] instructed that, if you find for the plaintiffs and should find that the loss of and the injuries to the cattle were occasioned by the negligence of the defendant, then you should award the plaintiffs' damages as follows: (a) The fair market value at Seville, Mont., of the 155 head of cattle in the condition in which such 155 head would have arrived at Seville, Mont., on or about the 18th day of July, 1917, had they not been injured and died by reason of the negligence of the defendant. * * * " The first objection to this instruction is that it assumes that 155 head of cattle were lost to the plaintiffs by reason of the negligence of the defendant.

The answer admitted and the testimony showed that 142 head of the cattle died before they were reloaded at Great Falls for shipment to Seville, and that seven head were left at Great Falls after this shipment, but the record is not clear as to whether they were left in care of the defendant or plaintiffs. It was shown, however, that two of these seven head were subsequently butchered by a veterinarian who had been employed by the plaintiffs when the cattle were being unloaded. It was also shown that after the cattle arrived at Seville six head died, but when they died and the cause of

their death was left uncertain. The witness Thorp testified that they died "later in the fall," and again that they died "shortly after arrival at Seville," and the witness Wright testified that there were a few head which "died shortly after arrival at Seville."

This testimony does not show that the butchering of the two head of cattle which were part of the seven head left at Great Falls and their consequent loss to the plaintiffs was the result of any act, negligent or otherwise, of the defendant, nor does it show when or from what cause the other five had died. The same statement is true with reference to the six head which died at Seville. Under this testimony it is only conjectural that the loss of the thirteen head of cattle last mentioned was due to any fault of the defendant.

It may be noted here that, of the 142 head of cattle which died at Great Falls, 140 were three year olds and two were yearlings; that of those which subsequently died at Great Falls and Seville seven were yearlings and six were three year olds. The highest value placed on the three year olds was $100 per head, and on the yearlings $60 per head, making the total maximum value of the thirteen head last mentioned $1,020.

This instruction in direct language told the jury that, if plaintiffs were entitled to recover at all for any cattle which died, they must award them the value of 155 head; in other words, that the plaintiffs should either recover for 155 head or nothing. The instruction was not warranted by the evidence, and it was error to give it.

7. In instruction No. 22 the court told the jury: "If you [11] find in favor of plaintiffs, you may allow them interest upon the damages which you find they have sustained at the rate of 8 per cent per annum from the 18th day of July, 1917, to this date." Defendant objected to the giving of this instruction upon the ground, amongst others, that the allowance of interest in this kind of an action is only in the discretion of the jury, and requested the court to add to the instruction the

words, "Interest is in your discretion," which request was refused.

Section 8663, Revised Codes of 1921, provides: "In an action for the breach of an obligation not arising from contract and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." In the case of *Dewell* v. *Northern Pacific Ry. Co.,* 54 Mont. 350, 170 Pac. 753, it was held that under this statute interest may be allowed to the plaintiff in an action such as this. Counsel argue that the jury would understand this instruction as meaning that they "must" award interest; that is, that it was one item which they might award, and not an item which they might not award.

In cases where an instruction of this kind is warranted the jury should be specifically advised that the allowance of interest is in their discretion, and the court should have modified the instruction as requested by the defendant. However, it is impossible to say from this record whether the jury did in fact allow any amount of interest. The complaint asked for damages in the sum of $45,000. The testimony on the part of the plaintiffs tended to show damages accruing to them, without taking the item of interest into consideration, in excess of $30,000, and the verdict of the jury was in favor of the plaintiffs for the sum of $20,685.90.

8. The court's instructions 6 and 7 on the burden of proof were in accord with the rule in this state as laid down in the case of *Nelson* v. *Great Northern Ry. Co.,* 28 Mont. 297, 72 Pac. 642, and are not objectionable.

9. This disposes of all of defendant's specifications of error, save only the one that the verdict was excessive and was against the weight of the evidence.

The court erred in giving and refusing to give instructions as detailed in the foregoing discussion. However, the error in instruction No. 8, which was given, and in refusing defendant's requested instructions Nos. 27 and 27A, related only to

the unloading and care of the cattle at Great Falls. The error in instruction No. 11 was in assuming that the plaintiffs were entitled to recover for 155 head of cattle if entitled to recover at all. Had the instruction been limited to 142 head, it would not have been erroneous. The discussion of instruction No. 22 shows that we are unable to say whether the jury did in fact allow the plaintiffs any amount for interest on the damages found.

We have carefully reviewed all of the testimony given at the trial. Eliminating from consideration the unloading and feeding of the cattle at Great Falls and the loss of the thirteen head which died subsequent to the reshipment from that point, we are confronted with the situation that as to the remaining 142 head there was a direct conflict in the testimony upon all of the alleged negligent acts of the defendant and the alleged acts of contributory negligence on the part of the plaintiffs. These matters were all thoroughly tried and submitted to the jury for their determination under proper and sufficient instructions. The jury resolved these issues in favor of the plaintiffs. From the record we cannot say that their finding in that respect was against the weight of the evidence.

With reference to the thirteen head of cattle which plaintiffs claim were lost to them subsequent to the time when the stock was reshipped from Great Falls to Seville, and which we have above determined were, according to the testimony, of the maximum value of $1,020, the judgment cannot be sustained for the reasons indicated in our discussion of instruction No. 21.

Our conclusion on the whole case is that it should be and is hereby remanded to the district court of Yellowstone county, with directions to grant a new trial unless within ten days after the filing of the *remittitur* the plaintiffs shall give their consent in writing that the judgment be reduced in the sum of $1,020. If such consent is given, the judgment will be modified accordingly as of the date of its original entry, and

together with the order denying the new trial will stand affirmed, each party to pay his own costs on appeal.

*Remanded with directions.*

Mr. Chief Justice Callaway and Associate Justices Cooper, Holloway and Galen concur.

Rehearing denied March 19, 1920.

Record certified to supreme court of the United States April 27, 1923, on application for writ of *certiorari*.